OPINION OF THE COURT
Dudley L. Lehman, J.
By way of extension of placement/permanency petition filed by Suffolk County Department of Social Services (DSS) on Feb *662 ruary 19, 2003 pursuant to Family Court Act § 1055, the court conducted a hearing on April 1, April 2 and April 3, 2003 regarding the service plan and the permanency goals for Damien A., an infant born on February 21, 2002 who was first removed from the respondent mother on or about February 23, 2002 pursuant to Family Court Act § 1027 and who remained in foster care after the underlying neglect petition was established against the respondent mother on September 26, 2002.
Having heard from the Department of Social Services, the respondent and the Law Guardian, and in consideration of the totality of the evidence that was introduced at the extension/ permanency hearing, the court makes the following findings and conclusions in the disposition of this matter.
Notwithstanding that this extension/permanency hearing spanned the better part of three full court days, the underlying facts were not seriously disputed. The subject child, Damien, was born on February 21, 2002; his mother, Jannie D., was 16 years of age at the time of birth and was herself a foster child in the custody of Suffolk County DSS. The father of the child was ultimately named by Jannie and a filiation proceeding has recently been filed against him by DSS. Damien was removed from his mother by court order on or about February 23, 2002 and placed in foster care in the home of Sherri Browne, where he remains to date. A neglect proceeding was filed against Jannie after Damien’s birth and the petition was ultimately established on September 26, 2002, with a comprehensive article 10 order being entered on that date.
Jannie is herself a product of the foster care system and she originally presented with numerous social, behavioral and mental health issues, many of which were the predicate for the neglect finding against her. At all relevant times, Jannie was in the lawful custody of Suffolk County DSS. On June 17, 2002, DSS placed her in an RTC program at KidsPeace National Center in Pennsylvania, where she remains to date. The testimony of the social worker at KidsPeace (A. Garner) indicates that Jannie has received the maximum benefit at KidsPeace and that there is little progress that remains to be made by Jannie at that facility. The social worker noted that Jannie still needs to obtain her GED, as well as securing employment training, learning job skills and receiving some counseling for what was described as anger/stress management. *663 The social worker was further of the opinion that Jannie could safely care for her son with some adult supervision and that a transition period would be appropriate, with Jannie being given the opportunity to spend more time with Damien with a view toward caring for him independently.
The child’s caseworker, C. Franco, testified that the permanency goal for Damien was, and still is, “return to parent,” albeit at some point in the future when Jannie has reached her majority and has otherwise obtained the skills necessary for independent living. The permanency plan offered by this caseworker was for Jannie to be housed in a DSS approved group home upon her discharge from KidsPeace, for Jannie to receive appropriate services such as job training, education (GED), part-time employment and some counseling, as well as increased visitation with Damien, including overnights. The caseworker’s testimony was buttressed by the testimony of DSS caseworker E. Hague. Both caseworkers took the position that some form of “step down” process was appropriate for Jannie after her discharge from KidsPeace and that this would best be met by a group home, perhaps for as little as six months. Neither caseworker was able to name a particular group home for Jannie that DSS had investigated or approved. In fact, it appears that DSS has undertaken no firm steps in this regard other than to suggest that this was the plan.
As previously noted, the facts surrounding the general permanency plan for Damien were not seriously disputed. There was no real challenge to the claim that reunification of mother and child was the goal, that there were obvious barriers to the immediate attainment of this goal, that Jannie needed to work toward independent living, that she needed certain services and skills before she could reach a state of independence, that she did not need to remain at KidsPeace any longer, and that Damien should begin to see his mother more frequently and develop a bond with her in the transition from his being in foster care to his complete return to her.
The real dispute between the parties, in the final analysis, is the way that this plan of reunification will be realized. DSS seeks a transitional period with Jannie residing in an approved group home. Jannie’s proposal, as presented by her own testimony, is that she be moved by DSS into Damien’s present foster home and that she be monitored, supervised and trained, i.e., mentored by Damien’s foster mother, Sherri Browne. Toward this end, Ms. Browne testified that she would be more than willing to have Jannie reside with her and that she would *664 facilitate full development of the parent-child relationship that is needed between Damien and his mother. Ms. Browne stated that she would work with Jannie and DSS in having Jannie obtain the skills and services that she needs, that she would assist her in these endeavors and that she would ensure that Jannie learns how to properly fill the role of parent. Jannie expressed a real preference for this plan, as opposed to being housed in a group home. She felt it would better facilitate her bonding with Damien and her caring for him as a parent. She also pointed to the extreme difficulty that she had with DSS group homes in the past, which is ostensibly well documented in DSS records.
DSS did not produce any evidence that Jannie’s proposal was in any way improper or unsafe for Damien or that the stated “transition” could not be realistically accomplished in this manner. Indeed, DSS’s position was simply that it preferred a group home for Jannie and that the court had no legal authority to direct that Jannie, a foster child herself, be placed by the Commissioner in a particular foster home, particularly when the court was reviewing and determining Damien’s permanency plan, not his mother’s.
The court does not agree with DSS’s jurisdictional contentions in this regard. In the court’s mind, the present statutory scheme for permanency hearings and orders, as well as the overriding policy of this state which reflects the mandates of Adoption and Safe Families Act, gives the Family Court broad authority and wide discretion in directing the provision of services to the child and his or her parent. Indeed, Family Court Act § 1055 (b) (iv) (A) (2) specifically states that when determining whether to extend placement of a child (such as Damien), the court shall determine whether to adjust or modify the child’s service plan and “may issue appropriate orders pursuant to section [1015-a] of this chapter” (emphasis supplied). Further, Family Court Act § 1055 (c) unequivocally states that in addition to a permanency/extension order, the court may direct DSS to undertake diligent efforts to encourage and strengthen the parental relationship and that such an order (extension/permanency) may “include a specific plan of action for such agency or official including, but not limited to, requirements that such agency * * * assist the parent * * * in obtaining adequate housing.” (Emphasis supplied.) Family Court Act § 1015-a clearly and succinctly grants the court the authority to “order a social services official to provide or arrange for the provision of services and assistance to the child and his or her *665 family to facilitate the protection of the child, the rehabilitation of the family and, as appropriate, the discharge of the child from foster care.” (Emphasis supplied.) Finally, Family Court Act § 1055 (c) adds that the authority of the court to issue directions under Family Court Act § 255 (which itself grants the court broad authority to enter orders against public officials) shall not be limited by the specific authority under this particular section.
The words and phrases used by the Legislature in Family Court Act § 1055 are not empty or illusory. They were obviously meant to have impact and significance. The court believes that Family Court Act § 1055 (c) was intended to deal with the precise situation that is before the court on this permanency hearing, to wit, where the absence of appropriate or adequate housing for the parent is standing in the way of the reunification of parent and child, where a specific action plan is needed to further the agreed-upon permanency goal but the agency is unwilling or reluctant to undertake such a plan, where services are required to bring the parent and the child together, where increased visitation and the development of a parental bond is obviously necessary but a bureaucratic, almost ceremonial, “form over substance” attitude by DSS is standing in the way of the type of permanency that is in the best interests of this infant. Family Court Act § 1055 speaks volumes in terms of judicial authority in a permanency hearing, and this court finds that it may order DSS to take proper steps to achieve that which everyone connected with this permanency hearing openly agreed was appropriate, that being the reunification of Damien A. and Jannie D. in the near future. This court believes, and finds, that Jannie and Damien should be housed in the same residence and that adequate housing must be furnished for Jannie by DSS in the home of Sherri Browne. The court finds this to be the most appropriate manner for Damien and Jannie to be reunified and to allow the goal of independence to be attained.
To the extent that DSS relies upon Matter of Lorie C. (49 NY2d 161 [1980]) for the proposition that the court’s authority in this regard is limited, this court specifically finds that the case is entirely distinguishable. Lorie C. involved a sweeping, broad order by the Family Court in a PINS case under Family Court Act 7 which usurped the authority of DSS. The instant proceeding deals specifically with Family Court Act § 1055, which, in its present form, was enacted long after the Court of Appeals decision in question.