OPINION OF THE COURT
Elrich A. Eastman, J.
This is a petition for foster care review pursuant to Social Services Law § 392. This is the second review, the first having occurred in 1983 whereby foster care was continued until June 1984. The application was filed in August 1984 seeking further continuance of foster care for this child.
Reviewing the file herein, it is established that this child, Enrique R. born September 13, 1979, came into the city’s foster care system in 1980. At that time he was placed with the Bureau of Child Welfare by his maternal grandmother because of her inability to properly care for the child. Both of the child’s parents are drug addicts undergoing treatment, and are unable to provide a stable home for this child at this time. On December 2, 1981 the child was discharged to the maternal grandfather but was returned to care on December 15, 1981. The child has been in a foster home since that time *957 and has adjusted well. Efforts to discharge this child to his parents have failed, albeit they visit regularly.
The agency has explored other family resources and has determined that the parental grandmother is a fitting person to provide a permanent home for this child within the family structure with access to both parents while they tackle their drug problems. All of the parties agree on this plan and emphatically indorse it as serving the best interests of this child. However, plans to discharge the child to the paternal grandmother cannot be finalized because of her inadequate housing. Under Family Court Act § 255 and Social Services Law § 392 this court issued an order to the effect that: "(1) the New York City Housing Authority assist Gladys T. in finding an apartment in Manhattan, preferably in the Lower East Side, so that her grandson, Enrique R., may be discharged from foster care into her care.” To date no adequate housing has been provided for her so that the child continues in foster care, notwithstanding unanimous agreement that the child’s best interest would be served by discharge to the paternal grandmother.
At issue is the continuation of foster care solely by reason of inadequate housing.
Social Services Law § 392 (1) defines foster care thusly: "care provided a child in a foster family free or boarding home, group home, agency boarding home, child care institution, health care facility or any combination thereof’. It is generally conceded that the poor resort to foster care more frequently than other persons. In many instances, the system becomes "a dead end” to family rehabilitation and often results in termination of parental rights. Recognizing the effect of prolonged foster care upon children, the Legislature stated its findings and intent: "The legislature further finds that many children who have been placed in foster care experience unnecessarily protracted stays in such care without being adopted or returned to their parents or other custodians. Such unnecessary stays may deprive these children of positive, nurturing family relationships and have deleterious effects on their development into responsible, productive citizens.” (Social Services Law § 384-b [1] [b].)
Thus, it is clearly evident that the State, as parens patriae of children in its jurisdiction, has as its goal to provide a permanent home for the child in foster care. It favors preservation not severance of natural familial bonds. (Santosky v Kramer, 455 US 745.)
*958 Under Social Services Law § 392 this court shares that parens patriae role in determining continued foster care. Aptly stated in Matter of Roxanne F. (104 Misc 2d 680, 684, revd on other grounds 79 AD2d 505) is the following: "By express provisions, the court possesses 'continuing jurisdiction’ and is explicitly vested with singular power to effectuate its decision. Indeed, through the medium of section 392 of the Social Services Law, the court shares direct responsibility with the executive and legislative branches in the State’s parens patriae role vis-á-vis the foster child.”
Personifying the State’s parens patriae power in the instance of foster children, the Commissioner of Social Services is the legal mechanism through which that power is exercised. Underscoring this, the court in Matter of Smith v Lascaris (106 Misc 2d 1044, 1047) stated: "The State created a legal mechanism to that end whereby the Commissioner of Social Services, essentially, acts as a trustee for or custodian of a child pursuant to an order of the court. The court may order the commissioner to meet conditions it deems proper (Family Ct Act, § 634), such as to diligently seek an adoptive home for the child. This statutory scheme is consistent with the doctrine of parens patriae” (emphasis added).
Thus, it is incumbent upon the Commissioner of Social Services and his agents to take all the steps necessary to implement the State’s goal of permanency for foster children and likewise to affect such a plan as comports with the child’s best interests. Here, discharge to the paternal grandmother satisfies that goal but for her inadequate housing.
The problem of adequate housing for the poor is indeed a national social problem that has defied solution. Children trapped in the foster care system because of poor housing are caught in a veritable catch-22 situation. Their parents or family are unable to regain their children without adequate housing and cannot acquire housing without adequate funds. Such funds are not usually available until the children are returned home. Indeed, these children are hostages to the ill fortunes of their families.
Recognizing that inadequate housing plays a significant role in the placement of children in foster care, the Mayor’s Task Force on Foster Care Services in its report entitled "Redirecting Foster Care, June 1980” noted: "The New York City Housing Authority does not recognize 'families on the threshold’ explicitly as a priority” (p 16). To overcome this deficiency in housing policy, the Task Force recommended as follows:
*959 "VI. — Families on the threshold of placement should be given the same preference for emergency housing services as families in other emergency situations.
"VII. — Policy directives should be issued wherein the New York City Housing Authority’s 'Tenant Selection’ regulation explicitly gives preference to families at risk of placement along with other priority families” (pp 19, 20).
In 1984, the Mayor’s Task Force on Foster Care report on the implementation of its earlier recommendations made the following observations: "It is clear that housing priority for families at risk of placement as well as families with children in placement would have a significant impact on both the number and duration of placements” (p 20).
Accordingly, the Task Force noted the extent of the implementation of its recommendation of preference for families at risk by the New York City Housing Authority, as follows: "This recommendation was briefly implemented and then abandoned. Currently, no Housing Authority apartments are allocated for SSC clients. The Housing Authority established a program to provide a total of 25 apartments for SSC clients from December 1980 to April 1983. It was terminated once the 25 apartments were filled. Eligibility was restricted to families active in SSC’s Office of Direct Child Care Services who had a child in foster care and whose lack of housing was the only deficit preventing discharge of the child” (p 29).
The Monitoring Committee of the Mayor’s Task Force on Foster Care urges that this apartment allocation be resumed and the Commissioner of SSC have the authority to designate a limited number of families for priority placement. These recommendations and observations of the Task Force clearly delineate the scope of this problem of inadequate housing. Embodied in the Regulations of the Department of Social Services is the principle that lack of adequate housing should not be the sole basis of foster care. Mandated preventive services are considered essential under circumstances stated thusly, at 18 NYCRR 430.9 (c) (4) (ii): "the first assessment summary shall describe in the same section what financial needs, including a lack of adequate housing, impairs the parents’ or caretakers’ ability to care for the child adequately and what specific risk to the child exists, if such needs are not met.”
These several pronouncements reflect the concern of officials with the relationship between the foster care system and *960 inadequate housing. Notwithstanding the perceived obstacles this court is authorized to order an agency, acting as parens patriae, to assist in obtaining adequate housing, inter alia. Stated in Social Services Law § 392 (9): "The court may make an order directing an authorized agency to undertake diligent efforts to encourage and strengthen the parental relationship when it finds such efforts will not be detrimental to the best interests of the child. Such order may include a specific plan of action for the authorized agency including, without limitation, requirements that such agency assist the parent in obtaining adequate housing, employment, counselling, medical care or psychiatric treatment.” (Emphasis added.) See also, Judge Rand’s order dated October 29, 1984 mandating suGh assistance.
The extent of the assistance given to a parent in need of adequate housing to forestall foster care placement or continued placement need not be limited to writing letters or making telephone calls. Such assistance could include legal action on behalf of the parent to secure a preference in tenant selection for public housing or any other effective procedure. Aptly stated in the case of New York City Hous. Auth. v Miller (89 Misc 2d 141, 144-145): "To the extent that tenant selection is subject to judicial review, the appropriate remedy is by special proceeding pursuant to CPLR article 78 in the Supreme Court, not by orders such as those under consideration. Nothing in section 255 of the Family Court Act confers such power on that court.”
In the instant case, discharge plans are agreed upon for this child whose infancy has been spent in foster care. The sole deterrent to that plan is the inadequate housing of the parental grandmother, the proposed caretaker. This child’s paternal grandmother has applied for public housing since 1980. Upon being advised that her application could not be found she refiled in 1984. The prospects of her name being reached, without a preference, before this child reaches its adolescence in foster care, are not encouraging.
Accordingly, the Commissioner of Social Services and the McMahon Services for Children are directed to assist this proposed caretaker in acquiring adequate housing so as to terminate the continued foster care of this child. Such assistance shall include but not be limited to such appropirate *961 legal proceedings including CPLR article 78 proceedings. Pending the acquisition of suitable housing for the paternal grandmother herein, foster care is continued for the statutory period.